## UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| CREEKWOOD RENTAL TOWNHOMES, LLC and RICHARD LEWANDOWSKI | Civil No. 10-2179 (JRT/JJK) |
| Plaintiffs, | **MEMORANDUM OPINION AND ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT** |
| v. | |
| KILN UNDERWRITING LIMITED, *a Capital Provider for Lloyd's Syndicate No. 510, which Syndicate subscribed severally, as its interests appear thereon and not jointly, to Lloyd's Certificates No. NMB 101-0203 as the Lead Underwriter* | |
| Defendant. | |

Edward Eshoo, Jr., **CHILDRESS DUFFY LTD.**, 500 North Dearborn Street, Suite 1200, Chicago, IL 60654; and **SCOTT A. WILSON**, 310 Fourth Avenue South, Suite 5010, Minneapolis, MN 55415, for plaintiffs.

Arthur J. McColgan, II, **WALKER WILCOX MATOUSEK, LLP**, 1 North Franklin Street, Suite 3200, Chicago, IL 60606; and Stephen P. Laitinen, **LARSON KING, LLP**, 30 East Seventh Street, Suite 2800, Saint Paul, MN 55101, for defendant.

Plaintiffs Richard Lewandowski and Creekwood Rental Townhomes, LLC

("Creekwood") (collectively, "Plaintiffs") bring this action against Defendant Kiln

Underwriting Limited ("Kiln"), alleging breach of contract. Kiln insured five townhome

buildings that are owned by Lewandowski and leased to tenants through Creekwood.

This dispute arises out of damage to the roofs of those buildings allegedly caused by a

hail storm. An appraisal panel determined that the replacement cost for all of the damage

to the property – including the roofs – was $262,368.51.  Because Kiln concluded that damage to the roofs was due to wear and tear – a cause excluded from coverage under Plaintiffs' insurance policy – Kiln paid Plaintiffs only the portion of the award for damages to other parts of the property.  Plaintiffs then brought this action alleging breach of contract for Kiln's failure to pay the remainder of the appraisal award and seeking a second appraisal for consideration of damages allegedly not considered by the first appraisal panel.  Plaintiffs and Kiln both move for summary judgment.  Because the Court finds that no material issue of fact remains regarding Plaintiffs' entitlement to the full appraisal award, it will grant Plaintiffs' motion for summary judgment to the extent it seeks to recover the remainder of the award.  Additionally, because the Court finds that Plaintiffs are not entitled to a second appraisal as a matter of law, it will grant Kiln's motion for summary judgment with respect to that claim.

## BACKGROUND

### I.    THE PROPERTY & THE INSURANCE POLICY

At the time of the hail storm giving rise to the present lawsuit, Lewandowski and his wife Lalainia were co-owners of five townhome buildings located in the 7100 block of Excelsior Way in St. Louis Park, Minnesota ("the Property").  (Def.'s App.,[1] Ex. M at 4, May 3, 2013, Docket No. 246; Decl. of Paul Shapiro, Exs. 1-5, Oct. 29, 2012, Docket

---

[1] Kiln filed a document entitled "Exhibit" at Docket Number 246 which contains all of its exhibits in support of its motion for summary judgment.  To avoid confusion with other exhibits, this Order refers to the "Exhibit" Document as "Def.'s App.," followed by citation to the relevant exhibit contained therein.

No. 201.)[2] Lewandowski and Lalainia were also the sole owners of Creekwood. (Second

Aff. of Arthur J. McColgan, Ex. 2 (Dep. of Richard J. Lewandowski ("Lewandowski

Dep.") 11:21-12:9), Oct. 21, 2011, Docket 104.) Lewandowski became the sole owner of

Creekwood sometime after November 22, 2010, when he and Lalainia divorced.

(Lewandowski Dep. 11:19-12:9.) Creekwood executed lease agreements with tenants for

the townhomes on the Property. (*Id.* 12:18-13:12; List of Exhibits, Ex. C, Oct. 30, 2012,

Docket No. 210.)[3]

Kiln issued Policy No. NMB101-0203 ("the Policy"), a commercial property

policy providing insurance to Plaintiffs for the period March 23, 2008, through March 23,

2009. (Def.'s App., Ex. A.)[4] The Policy was issued to Creekwood, Lewandowski, and

Lalainia as named insureds. (*Id.*, Ex. A at 4.) The premises described in the Policy's

declarations include the Property. (*Id.*, Ex. A at 5-6.)

Under the Policy, Kiln agreed to "pay for direct physical loss of or damage to

Covered Property at the premises described in the Declarations caused by or resulting

---

[2] With the exception of depositions, all page numbers in record citations in this Order refer to the CMECF page number, not the page number of the original document or exhibit.

[3] Creekwood was administratively terminated as a corporate entity on August 3, 2012, for failure to file an annual renewal with the Minnesota Secretary of State's Office. (List of Exhibits, Ex. C at 5.)

[4] The parties have produced, and rely upon, two different policies in support of their motions for summary judgment. Plaintiffs cite to a 36-page policy attached as Exhibit A to their amended complaint. Defendant cites to a 64-page policy attached as Exhibit A, to Def.'s App. The parties clarified at oral argument that the two policies are identical, but that Defendant's exhibit includes additional business coverage forms which are not relevant to the present motions.

from any Covered Cause of Loss." (*Id.*, Ex. A at 31.)  A cause of loss is covered under the Policy unless specifically excluded or limited.  (*Id.*, Ex. A at 6, 45.)[5]  The Policy excludes from coverage "loss or damage caused by or resulting from" among other things "[w]ear and tear" and "[r]ust or other corrosion, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself." (*Id.*, Ex. A at 46.)  Additionally, the Policy provides that Kiln "will not pay for loss or damage caused by or resulting from . . . [f]aulty, inadequate or defective . . . [m]aterials used in repair, construction, renovation or remodeling [or] [m]aintenance," unless the faulty materials or maintenance "result[] in a Covered Cause of loss." (*Id.*, Ex. A at 47-48.)

On March 23, 2008, Kristin Dill of Kiln conducted an inspection of the Property and noted that the roof was in "average" condition.  (Aff. of Coleman J. Braun ¶ 4, Ex. 2 at 2, Ex. 3, July 20, 2011, Docket No. 47.)  An underwriting inspection conducted by Kiln on April 7, 2008, also noted that the buildings were in "good" condition.  (Second Aff. of Scott May, Ex. 2 at 3, Dec. 1, 2011, Docket No. 140.)

## II.   HAILSTORM AND RESULTING DAMAGE

On May 31, 2008, a hailstorm struck St. Louis Park.  (Am. Compl. ¶ 12, July 26, 2010, Docket No. 23; Lewandowski Dep. 20:13-25; Second McColgan Aff., Ex. 3.)  On June 3, 2008, Plaintiffs submitted a claim under the Policy, and described the damage for

---

[5] Under an all-risk insurance policy, like the Policy at issue here, "[r]ecovery will be allowed for all fortuitous losses not resulting from misconduct or fraud, unless there is a specific provision expressly excluding the loss from coverage." *Sonstegard Foods Co. v. Willington Underwriting, Inc.*, Civ. No. 05-532, 2007 WL 1501278, at *4 (D. Minn. May 21, 2007); *see also Sentinel Mgmt. Co. v. N.H. Ins. Co.*, 563 N.W.2d 296, 299 (Minn. Ct. App. 1997).

which coverage was sought as "[h]ail storm damage to roofs of buildings." (Second McColgan Aff., Ex. 3.)

On January 14, 2008 Jeff Queen from Kiln's claims adjuster, North American Claim Services, Inc. ("NACS"), met with Lewandowski's roofing contractor to conduct an inspection of the Property. (*Id.*, Ex. 4 at 2, 4.) Queen concluded that "the roofs were in need of repair/replacement" "due to the deterioration of the shingles caused by typical weather conditions," and that "it did not appear that hail caused any additional damage to the actual roof, but for minor hail dents in the roofing vent caps." (*Id.*, Ex. 4 at 4-5.) NACS then retained a registered roofing observer, Wendell O. Finken of AMBE, Ltd., who inspected and photographed the roofs on September 19, 2008, and prepared a report. (*Id.*, Ex. 4 at 5; *id.*, Ex. 5.) Finken concluded:

> Based on our inspection we feel the existing roofs are currently in need of replacement. Deterioration and what appeared to be recent hail damage has left the roof system in a condition that cannot be relied upon to remain watertight. The degree of deterioration varies throughout the roof but we feel the entire roof should be completed as one project.
>
> Shingles on the north and lower roof sections do not show signs of hail damage but are nearing the end of their lifespan and currently need replacement. The south facing roofs are damaged by hail but it appears that . . . the roof was already deteriorated which greatly furthered the degree of damage. In addition, we recommend further investigation to determine if all roof areas are properly vented, and if the potential wall issues are resulting in deterioration of the roof system.

(*Id.*, Ex. 5 at 3-4; *see also id.*, Ex. 4 at 5.)

NACS reported its findings to Kiln in a letter dated October 21, 2008. (*Id.*, Ex. 4.) Citing the provisions of the Policy that exclude coverage for losses caused by wear and tear or inadequate maintenance, NACS recommended that Kiln decline coverage because

"the current roofs pre-loss, were in dire need of maintenance and repair due to the deterioration of the existing shingles prior to the hail storm." (*Id.*, Ex. 4 at 3-4, 6.) NACS noted that "[t]he hail exacerbated the deterioration of the southern portion of the roof shingles which were already in need of replacement." (*Id.*, Ex. 4 at 3.) NACS also stated that Finken believed defective shingles may have caused at least part of the damage. (*Id.*, Ex. 4 at 5.) NACS concluded:

> In review of the policy and the investigation and inspection of the claim, the roof at the insureds['] buildings were in dire need of replacement due to wear and tear of the roof and the fact that the asphalt shingle used deteriorated excessively prior to reaching its intended age. The hail storm would not have damaged the roof shingles, if they had not been already deteriorated and [in] need of replacement. Evidence to this effect is shown in the northern portions of the roof in which the shingles are not as deteriorated as the southern portion of the shingles. The northern portion of the roof had no evidence of hail damage and only the southern portion had evidence of hail damage due to the deterioration of the shingle itself.

(*Id.*, Ex. 4 at 6.)

Additionally, in an email dated November 7, 2008, an NACS employee advised Kiln that Lewandowski "has fully admitted that he knew the roofs of the complex needed to be replaced long before the hail storm hit" but "[h]e just doesn't want to go down the same path of litigating against the product manufacturer who supplied what was suppose[d] to be a 25 year asphalt shingle that broke down in less than 8 years." (*Id.*, Ex. 6 at 2.)

## III.   DENIAL OF COVERAGE

Upon direction from Kiln, NACS sent Plaintiffs a denial of coverage letter dated November 21, 2008. (*Id.*, Ex. 7.) The denial of coverage was based on the provisions of

the Policy excluding from coverage damage caused by wear and tear or faulty

maintenance and Kiln's conclusion that the roof was in need of replacement prior to the

hailstorm due to deterioration of the shingles.  (*Id.*, Ex. 7 at 3-4.)  NACS informed

Lewandowski that "[a]ll parties acknowledge that the hail storm struck the roofs of the

property, however the replacement needed of the shingles is not caused by the hail

storm." (*Id.*, Ex. 7 at 3.)

Following the denial of coverage, Plaintiffs demanded an appraisal in an email

dated November 25, 2008.  (*Id.*, Ex. 8.)  The demand was made pursuant to the Policy's

Appraisal Condition, which states:

E. Loss Conditions

The following conditions apply in addition to the Common Policy
Conditions and the Commercial Property Conditions.

. . .

2. Appraisal

If we and you disagree on the value of the property or the amount of loss,
either may make written demand for an appraisal of the loss.  In this event,
each party will select a competent and impartial appraiser.  The two
appraisers will select an umpire.  If they cannot agree, either may request
that selection be made by a judge of a court having jurisdiction.  The
appraisers will state separately the value of the property and amount of loss.
If they fail to agree, they will submit their differences to the umpire.  A
decision agreed to by any two will be binding.  Each party will:

a. Pay its chosen appraiser; and

b. Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, [Kiln] will still retain [its] right to deny the claim.

(Def.'s App., Ex. A at 39.)

## IV.    NEW THIRD PARTY ADMINISTRATOR

In December 2008, Kiln appointed Engle Martin Claims Administrative Services, Inc. ("EMCAS") to replace NACS as Kiln's third party claims administrator. (Lewandowski Dep. 36:9-15; Def.'s App., Ex. D at 3.)  EMCAS retained Engle Martin & Associates ("EMA") to respond to the appraisal demand.  (Second May Aff., Ex. 7.) Scott May of EMA was appointed to serve as Kiln's adjuster on Plaintiffs' claim.  (Def.'s App., Ex. D (Dep. of Scott May ("May Dep.") 62:22-63:9); Second May Aff. ¶ 2, Ex. 7.)[6]

May met with Lewandowski at the Property in December 2008, to inspect the roofs, but did not complete the inspection due to weather conditions.  (*See* Lewandowski Dep. 38:21-39:23; May Dep. 117:20-25.)  May wrote Plaintiffs a letter on December 15, requesting that Plaintiffs contact him when the roofs were "free of snow and ice" so that they could be inspected.  (Second May Aff., Ex. 7.)  However, Plaintiffs had already replaced the roofs on two of the townhomes in October 2008 and replaced the roofs on the other three townhomes in the spring of 2009, before May was able to inspect them. (Lewandowski Dep. 124:6-19; Appraisal Hearing Tr. ("Tr.") 99, Aug. 3, 2011, Docket No. 66.)

---

[6] With respect to the replacement of NACS, May wrote in his notes that, according to an employee of EMCAS, the previous "adjuster did not do a good job in evaluating the loss" and that the third-party administrator and adjuster were fired.  (Braun Aff., Ex. 6; *id.* ¶ 10.)

## V.     THE APPRAISAL

Plaintiffs reiterated their appraisal demand in February 2009.  (Second McColgan Aff., Ex. 10.)  An appraisal panel was formed, consisting of three appraisers: Paul Norcia, who was appointed by Plaintiffs, Richard Herzog, who was appointed by Kiln, and James Stoops, who was selected by Norcia and Herzog to serve as the umpire.  (Second McColgan Aff., Ex. 11 (Dep. of Thomas Irmiter ("Irmiter Dep.") 60:9-21); Second May Aff., Ex. 9 at 3; Tr. 3.)

The appraisal was scheduled for April 29, 2009.  (Second McColgan Aff., Ex. 12 at 3.)  The appraisal panel, May, Lewandowski, and Lewandowski's expert Thomas Irmiter met at the Property to begin the appraisal.  (Second May Aff., Ex. 9 at 3.)  At the site visit, Norcia raised the issue that portions of the townhomes other than the roofs – specifically the fascia, downspouts, gutters, windows, and siding – may have also been damaged by the hail storm.  (*Id.*)  Umpire Stoops determined that the appraisal process could not proceed until the parties exchanged competing damage estimates relating to portions of the Property other than the roofs.  (*Id.*)

The appraisal was rescheduled to August 27, 2009, and consisted of a site visit followed by a hearing during which documentary evidence and live witness testimony was presented.  (Lewandowski Dep. 48:11-20; *see generally* Tr.)  The focus of the appraisal was "the scope and price issues pertaining to the storm damage claim that is at issue."  (Tr. 5.)  At the appraisal, in its opening statement Kiln admitted that there was damage caused by the hail storm to the soft metals on the north and east facing sides of the buildings and soft metal on the roof.  (Tr. 9.)  Kiln denied, however, that the shingles

were damaged by hail, claiming instead that damage was due to deterioration and defective shingles exacerbated by weather conditions and improper ventilation. (Tr. 9, 11-12.)

May testified that he saw evidence of delamination and blistering, but not hail damage on sample shingles from the Plaintiffs' roofs that were available at the appraisal hearing. (Tr. 86-87.) May further testified that it was difficult for him to make any recommendation to the insurance company about the damage because of the number of repairs that had been made on the Property prior to his inspection. (Tr. 91.) He also testified that he could not state whether there was hail damage to the roofs because of his lack of inspection. (Tr. 99.)

Kiln's engineering expert, Nathan Prieve, P.E., inspected photographs of the damage to the Property but did not inspect the roofs before they were replaced. (Tr. 151.) Based on the photographs, Prieve testified that the roofs of Plaintiffs' buildings sustained no hail damage on the north or south sides as a result of the May 31, 2008 storm. (Tr. 153-56.) He did state, however, that there may have been granule loss to the shingles from the storm. (Tr. 170.) He observed heavy wear and tear, erosion, and shingles that did not hold up as well as some other shingles. (Tr. 153.) He suggested that the wear was worse on the southern side because of the sun exposure. (Tr. 154.) He stated, based on having observed marks caused by the hail in other locations on the Property, that the hail that hit the roofs was relatively small in size. (Tr. 153, 156, 162-63.) While Prieve did not believe the damage to the roof was caused by hail, he admitted that there was no published standard on what constitutes a "hail hit" on a shingle. (Tr. 167.)

Finken, the roof consultant retained by NACS in September 2008 to assess Plaintiffs' claim, agreed with Prieve's testimony.   Finken testified, based upon his personal observation of the roofs that:

> I observed a roof that was extremely deteriorated and in need of replacement . . . . because of cupping, cracking, delaminating, [and] granules easily falling off.  There were areas where we suspected that water penetration could occur, the fact that some nails were exposed underneath because of the cracking and delamination.  Some openings in shingles.

(Tr. 119.)  He stated that the deterioration was worse on the south facing surfaces.  (*Id.* at 120.)  He further stated that he did not believe these issues were caused by hail but rather the deterioration was caused by "normal conditions," product failure, and improper ventilation.  (Tr. 119-20, 125.)  He opined that the south facing shingles were so far deteriorated that they could not hold up to normal weather conditions, including any level of hail.  (Tr. 126.)  Thus, he stated, "South facing roofs are damaged by hail but it appears that the roof was already deteriorated which greatly furthered the degree of damage." (Tr. 132-33.)  He clarified that the roof "was damaged to the point that it was completely and totally damaged" and had no more "useful life" before the hail storm and could thus not have been damaged further by hail, even though there were some hail marks.  (Tr. 133, 144-45.)  He did not notice any hail damage to the north facing slopes. (Tr. 132.)

Plaintiffs responded that there was hail damage on the roof.  (Tr. 27.)  Plaintiffs retained Irmiter, a licensed building official, to act as their damages consultant and to present evidence to the appraisal panel.  (Second McColgan Aff., Ex. 11 at 3.)  Irmiter works for Forensic Building Science, Inc. ("FBS").  (*Id.*)  Irmiter testified that he has

personally replaced hundreds of roofs, is a certified state building official, has a great deal of experience with shingles and roofing materials, and has been qualified as an expert by various courts on construction defects and other issues.  (Tr. 35-36.)  Irmiter consulted with Bryan Oakley of FBS, a professional engineer, in arriving at his conclusions.  (*See* Tr. 35; List of Exs. in Supp. of Mot. for Summ. J., Ex. D 48:6-17, Dec. 1, 2011, Docket No. 142.)

At the hearing, Plaintiffs produced actual shingles from the north side of the roofs and Irmiter testified that they showed hail dents rather than deterioration.  (Tr. 16, 27.)  Plaintiffs also produced photographs of the alleged hail damage.  In addition, Plaintiffs presented a damage estimate prepared by the Lindsay Consulting Group (the "Lindsay Estimate").  (Second McColgan Aff., Ex. 13.)  Irmiter personally prepared the Lindsay Estimate.  (Irmiter Dep. 62:16-17.)  The appraisal panel admitted the Lindsay Estimate into evidence.  (*Id.* 65:10-14; Tr. 20.)  The Lindsay Estimate concluded that the Property required $1,349,891.13 in repairs as a result of the May 31, 2008 hail storm.  (Second McColgan Aff., Ex. 13 at 11.)  The Lindsay Estimate called for total replacement of all roofs, window and stucco upgrades due to building codes, repairs to the soffit and fascia, repairs to gutters that would be damaged during replacement of the roofs, and installation of ice shields to prevent ice damming.  (*Id.*, Ex. 13.)  Irmiter testified that the Lindsay Estimate "represented the scope of work that was required as a result of the storm in its entirety," (Irmiter Dep. 66:22-67:7) and took "into account removing the roofs, removing the damaged windows, damaged doors, the damaged metal and replacing those areas" (Tr. 30).

With respect to the code upgrades referenced in the Lindsay Estimate, Irmiter testified that flashing had to be replaced on the roofs in order to meet city code requirements.  (Tr. 27-28.)  Irmiter also testified that certain costs of repairing the windows were required by city and zoning regulations.  (Tr. 28.)  Herzog asked Irmiter whether he had any documentation from his discussions with the building official regarding the work to the Property mandated by city and zoning regulations.  (Tr. 31.)  Irmiter indicated that he believed the information to be confidential, but that he could provide the appraisal panel with documentation if necessary to make its decision with regard to the codes.  (Tr. 31-32.)

With respect to material unavailability, Irmiter testified that because the shingles at issue were no longer manufactured, Plaintiffs had replaced the entire roof, affecting the scope and cost of the work.  (Tr. 27.)  May testified that he was unaware whether the original shingles used on the Property were still available.  (Tr. 110.)

## VI.    APPRAISAL AWARD

The appraisal panel issued an appraisal award on August 28, 2009, which was signed by Stoops and Herzog.  (Second McColgan Aff., Ex. 14.)  The letter accompanying the award indicated that "[t]he required two of the three appraisal panel members agreed on the loss at replacement cost and actual cash value per the attached award with one page detail."  (*Id.*, Ex. 14 at 2.)  The award is comprised of handwritten answers on a typed form.  (*Id.*, Ex. 14).  It lists the "loss date" as May 31, 2008 and the "cause" as "storm – wind & hail."  (*Id.*, Ex. 14 at 2.)  The panel calculated the loss

replacement cost at $262,368.51 and the loss actual cash value at $251,801.14. (*Id.*)  On the line for "Replacement cost of building(s) if requested" the award notes "Not Requested." (*Id.*)  Under a space designated for "CLARIFICATIONS IF ANY" the award states in handwriting:

> Gross loss.  All items.  Material availability not considered.  $10,567.37 depreciation on items not replaced to date

(*Id.*)

In handwritten notes attached to the typewritten form, the award states with respect to the roof:

> Roof – $542 □ w/ waste
> x $375 □ = $203,250 = $132,112.50
>             x 65%
> South + flashings + caps +
> extra cost to do ½
> vs entire roof . . . .

(*Id.*, Ex. 14 at 3.)   The award also provides individual award amounts for fascia ($9,205.00), door trim ($3,878.22), garage trim ($6,262.40), gutter/downspouts ($14,026.32), windows ($11,313.10), stucco tie in work ($48,000), dumpsters ($5,320), permits ($2,876.47), sales tax ($5,522.82), and profits and overhead ($23,851.68). (*Id.*)  Neither Kiln nor Plaintiffs ever asked the appraisal panel to reconsider, modify, or clarify the award.

## VII.   KILN'S PAYMENT

In October 2009, Kiln paid $111,190.05 to Plaintiffs, which Kiln claims was the portion of the appraisal relating to damage to the Property other than the roofs. (*See*

Second McColgan Aff., Ex. 14; Pls.' App., Ex. C, May 3, 2013, Docket No. 241.)[7]  Kiln

calculated this award as follows:

| Damaged Item Identified by Appraisers | Appraisal Award |
|---|---|
| Fascia | 9,205.00 |
| Door trim | 3,878.22 |
| Garage trim | 6,262,40 |
| Gutters/downspouts | 14,026.32 |
| Windows<br>(10 at $681.31 each for a total of $6,813.10 and 20 at $225 each for a total of $4,500. $6,813.10 + $4,500 = $11,313.10) | 11,313.10 |
| Stucco tie-in work | 48,000.00 |
| Dumpsters<br>(5 x $532 each) | 2,600.00 |
| **SUBTOTAL (1)** | 95,345.04 |
| Sales tax | 2,860.35 |
| Permits | 2,876.47 |
| **SUBTOTAL (2)** | 101,081.86 |
| Profits and overhead (10%) | 10,108.19 |
| **TOTAL** | $111,190.05 |

(Pls.' App., Ex. C.)  Kiln declined to pay the remaining $151,178.46 of loss replacement

damages[8] found by the appraisal panel, explaining:

> [i]t is Underwriters' position that coverage defenses exist as to the
> remainder of the award, which was for replacement of the southern portions
> of the roofs and the corresponding amount for dumpsters, sales tax, permits
> and profit and overhead.  Underwriters continue to reserve all rights as to

---

[7] Plaintiffs filed a document entitled "Exhibit" at Docket Number 241 which contains
some of its exhibits in support its motion for summary judgment.  To avoid confusion with other
exhibits, this Order refers to the "Exhibit" Document as "Pls.' App.," followed by citation to the
relevant exhibit contained therein.

[8] The parties appear to agree, for purposes of this motion, that the relevant appraisal
award figure was the $262,368.51 for loss replacement rather than the $251,801.14 for actual
cash value of the loss.

coverage for the roofs as set forth in their letters to the Insureds dated November 21, 2008 and August 26, 2009.

(*Id.*, Ex. C at 3; *see also* Am. Compl. ¶ 20.)

On June 10, 2010, Plaintiffs sent Kiln a letter demanding appraisal to determine the amount of loss for the following items of damages that they believed were not adequately considered or addressed by the appraisal panel:

- Material availability
- Window and stucco upgrades due to code
- Soffia
- Fascia
- Gutter damage due to roof replacement
- Ice damming and interior damage
- Unpaid overhead and profit

(Pls.' App., Ex. F.)  Kiln determined that Plaintiffs were not entitled to a second appraisal and declined to appoint an appraiser.  (Answer to First Am. Compl. ¶ 21, Aug. 9, 2010, Docket No. 25.)

## VIII.  SCOPE OF AWARD

In connection with the present motions, the parties dispute the scope of the items the appraisal panel considered in rendering the award.  Plaintiffs and Kiln have submitted the testimony of various individuals to support their respective positions that the award failed to take into consideration certain damages to the Property and that the award constituted a complete finding with respect to damage to the Property resulting from the May 2008 hail storm.

Lewandowski testified that he believed the entire scope of damages that occurred at the Property as a result of the hail storm had been presented to the appraisal panel. (Lewandowski Dep. 45:5-10.)  Appraiser Herzog also submitted an affidavit in which he indicated that the appraisal panel "initially was tasked with determining the fair and reasonable cost to repair roof damage to Plaintiffs' five townhomes resulting from a hailstorm that took place on May 31, 2008."  (Aff. of Richard F. Herzog, P.E., ¶ 4, Oct. 21, 2011, Docket No. 105.)  Herzog also indicated that as a result of the initial site visit, the parties were allowed to present evidence of "the damage resulting from the May 31, 2008 hailstorm" and the appraisal panel "considered all of the damage evidence and testimony presented by both parties."  (*Id.* ¶¶ 9, 11.)  Appraiser Norcia submitted an affidavit explaining that "[t]he appraisal award of August 27, 2009, provides the amount of loss for items which were either directly damaged from the hail event, or were immediately effected by the replacement of said hail damaged items."  (Pls.' App., Ex. D (Aff. of Paul Norcia ("Norcia Aff.") ¶ 4).)

With respect to the cost of replacing portions of the Property for purposes of code upgrades, Herzog averred that Plaintiffs were not precluded "from introducing evidence about code upgrades," but "did not cite any sections of the building code that would be applicable to the proposed repairs, and did not submit any documentation relating to the upgrades related to changes in the building code applicable to the proposed repairs." (Herzog Aff. ¶ 10.)  Therefore, the panel considered only the evidence of code upgrades contained in the Lindsay estimate.  (*Id.*)  With respect to material availability, Herzog indicated that the panel did not consider material availability "because Plaintiffs had

already replaced all roofs prior to the August 27, 2009 appraisal hearing.  Therefore, the

issue of material availability was moot."  (Herzog Aff. ¶ 14.)  Appraiser Norcia, however,

indicated that

> Stoops made it clear that the appraisal panel would not on that day address
> any issues regarding code upgrades resulting from the replacement of
> damaged property or the costs associated with the matching of damaged
> property due to material availability.  As a result of that decision, the
> appraisal panel did not consider: damages to the roof due to material
> unavailability; damages to the soffit, fascia and gutter as a result of required
> roof replacement; the code upgrade damages for the windows and stucco;
> and the costs associated with the customary overhead and profit for the
> aforementioned damages."

(Norcia Aff., ¶ 3.)

## IX.    STUCCO SETTLEMENT AND OWNERS INSURANCE CLAIM

In the present motions, in addition to disputing the scope and significance of the

appraisal award as it relates to Plaintiffs' coverage under the Policy, the parties dispute

the impact of litigation by Lewandowski related to the Property that predated the May

2008 hail storm.

### A.    Stucco Litigation and Settlement

In 2007, the Lewandowskis sued the general contractor for the Property,

MM Home Builders, Inc., in Hennepin County District Court (the "Stucco litigation").

(Fourth Aff. of Kristine M. Sorenson, Ex. 1, Dec. 1, 2011, Docket No. 141.)  The claims

in the amended complaint in the Stucco litigation arose, at least in part, out of alleged

water damage to the townhomes at the Property discovered in the spring of 2007, prior to

the hailstorm.  (*Id.*, Ex. 1 at 4; Def.'s App., Ex. J at 3-4.)  The amended complaint stated

that the Lewandowskis discovered that the townhomes "had major construction defects and mold as a result of water infiltration into the wall cavities and sheathing [and] said damage was caused by negligence, departure from good building practices, and breaches of warranties of the Defendant." (Fourth Sorenson Aff., Ex. 1 at 4.)

Plaintiffs admitted in discovery in the present case that in the Stucco litigation they

> sought compensation for the cost of replacing the roofs of all five buildings due to the non-availability of certain roofing materials and the inability to match or reuse existing building materials, such as shingles. As a result, partial repair or replacement of the roofing systems was not believed to be an appropriate remedy.

(Def.'s App., Ex. J at 4.)  Plaintiffs also indicated that the compensation sought in the Stucco litigation was "for the cost of remedying the defects and/or deficiencies at issue in that litigation, which would include the cost of work performed to the townhomes at the property for those defects and/or deficiencies." (*Id.*, Ex. J at 4-5.)  Additionally, at the appraisal hearing, Irmiter admitted that Plaintiffs sued MM Home Builders based, in part, on allegations that the roofs needed to be replaced. (Tr. 53, 55.)

After the Lewandowskis filed the Stucco litigation, the general contractor brought third-party complaints against a number of subcontractors. (Fourth Sorenson Aff., Ex. 1 at 8-10.)  Although the parties have presented no specific information regarding settlements, it appears that the Stucco litigation resulted in multiple settlement agreements. (Tr. 73-74; Fourth Sorenson Aff., Ex. 3 at 4.)  The parties do not dispute that some of the settlement funds received in the Stucco litigation were used by Plaintiffs to fund replacement of at least some of the roofs on the Property. (Pl.'s Mem. in Opp'n

to Mot. for Summ. J. at 8, May 17, 2013, Docket No. 249; *see also* Tr. 55; Fourth

Sorenson Aff., Ex. 3 at 4.)


### B.    Property Insurer Claim and Settlement

In addition to the Stucco litigation, in 2007 the Lewandowskis asserted a claim

against their first-party property insurer, Owners Insurance Company, for water damage

to the townhomes.  (Def.'s App., Ex. J at 3-4; May Dep. 118:7-12.)  Plaintiffs described

the claim as one

> for water intrusion and sought compensation for such insured loss, which
> included the cost of repairing and/or replacing building components
> directly damaged by the water intrusion and/or the cause or reason for the
> water intrusion, as well as the removal and/or replacement of building
> components as necessary to effect the needed repairs, which scope of work
> included the removal and/or replacement of certain roof components.

(Def.'s App., Ex. J at 3.)  Plaintiffs also admitted that in connection with the water

damage claim they "contended the roofs of all five buildings should be replaced due to

the non-availability of certain roofing materials and the inability to match or reuse

existing building materials." (*Id.*, Ex. J at 4.)  Plaintiffs ultimately settled this claim with

their insurer, and used at least some of those funds to replace the roofs on all units on the

Property.  (Tr. 55; Fourth Sorenson Aff., Ex. 3 at 4 ("The proceeds from the Owners

settlement enabled the [Lewandowskis] to complete reroofing of all units and repairs of

14 of 38 units.").)

## X.    PROCEDURAL HISTORY

### A.    Complaint

On May 28, 2010, Plaintiffs' filed the instant lawsuit, alleging a single cause of action for breach of contract.  (Compl., May 28, 2010, Docket No. 1.)  Under the breach of contract claim, Plaintiffs allege that Kiln wrongfully withheld Policy benefits by failing to pay the remaining amount of the appraisal award and by refusing to engage in a second appraisal.  (*Id.*  ¶¶ 22-26.)  Plaintiffs amended their complaint to name Kiln as a defendant, removing other syndicates of Lloyd's of London.  (*Compare* Compl. at 1, *with* Am. Compl. at 1, July 26, 2010, Docket No. 23.)  On November 15, 2010, the Court granted Kiln's motion to deposit the disputed portion of the appraisal award into the Court's registry.  (Order, Nov. 15, 2010, Docket No. 40.)  A receipt for $151,178.46 was issued by the Court on December 17, 2010.  (Receipt, Dec. 17, 2010, Docket No. 41.)

### B.    Previous Motions for Summary Judgment

The parties previously filed motions for summary judgment that the Court denied as premature.  *See Creekwood Rental Townhomes, LLC v. Kiln Underwriting Ltd.*, Civ. No. 10-2179, 2012 WL 4481239, at *6 (D. Minn. Sept. 28, 2012).  The Court noted that the Lewandowskis had filed for Chapter 11 bankruptcy in the United States Bankruptcy Court for the District of Minnesota on March 5, 2007.  *Id.* at *2 (*see also* Bankruptcy Case No. 07-40727, Chapter 11 Voluntary Petition, Mar. 5, 2007, Docket No. 1).[9] Lewandowski did not initially disclose his pending claim against Kiln in his bankruptcy

---

[9]  The bankruptcy case is still open and is assigned to Judge Gregory F. Kishel.

proceeding and only disclosed the pending claim in a supplemental disclosure after the motions for summary judgment had been filed. *Creekwood Rental Townhomes, LLC*, 2012 WL 4481239 at *2. The Court determined that Lewandowski had not adequately disclosed his pending claim to the bankruptcy court and determined that "Lewandowski may not pursue his claim against Kiln until he establishes that he has properly disclosed his claim." *Id.* at *3-*4. Additionally, the Court found that it had insufficient information to determine whether Creekwood had any ownership interest in the Property and how any such interest affected its standing as a plaintiff, and directed the parties to file supplemental briefs addressing that issue. *Id.* at *5. The parties have since complied with the Court's September 28, 2012 directives. (*See* Pls.' Supplemental Mem., Oct. 29, 2012, Docket Nos. 198, 209; Def.'s Supplemental Mem., Oct. 29, 2012, Docket No. 200; Pls.' Resp. in Opp'n to Supplemental Mem., Nov. 13, 2012, Docket No. 218; Def.'s Resp. in Opp'n to Supplemental Mem., Nov. 13, 2012, Docket No. 221; Pls.' Mem. of Law in Supp. of Mot. for Status Conference, Mar. 14, 2013, Docket No. 234.) The Court then gave the parties permission to refile motions for summary judgment. (Minute Entry, Apr. 3, 2013, Docket No. 238.)

## ANALYSIS

In support of their present motion for summary judgment Plaintiffs argue that they are entitled to recover the remaining $151,178.46 of the appraisal award that Kiln declined to pay. Additionally, Plaintiffs argue that they are entitled to a second appraisal for consideration of certain damages to the Property allegedly not considered by the

original appraisal panel.   With respect to Plaintiffs' entitlement to the full appraisal award, Kiln argues that summary judgment in its favor is warranted because no coverage exists for the $151,178.46 portion of the appraisal award related to the roofs of the Property, as damage to the roofs was due to wear and tear – an excluded cause of loss under the Policy.   Additionally, Kiln argues that Plaintiffs may not recover the remainder of the appraisal award because they were already compensated for damage to the Property through the Stucco settlement and the water damage insurance settlement and used those funds to replace the roofs.   With respect to Plaintiffs' entitlement to a second appraisal, Kiln argues that the amount determined by the appraisal panel is binding and that Plaintiffs failed to follow the procedures set forth in the Minnesota Uniform Arbitration Act to revisit that amount.   Finally, Kiln argues that Creekwood lacks an insurable interest in the Property and therefore has no standing in the present lawsuit, and summary judgment in Kiln's favor with respect to Creekwood's claims is appropriate.

Although not framed specifically in terms of Plaintiffs' breach of contract claims, in essence the parties' arguments focus on whether material issues of fact remain regarding Kiln's alleged breach of the Policy – for failure to pay the full appraisal award and failure to submit to a second appraisal proceeding.   With this framework in mind, the Court will address each of the parties' contentions in turn.

## I.      STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of

law.  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences to be drawn from those facts.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Summary judgment is appropriate if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "To defeat a motion for summary judgment, a party may not rest upon allegations, but must produce probative evidence sufficient to demonstrate a genuine issue [of material fact] for trial."  *Davenport v. Univ. of Ark. Bd. of Trs.*, 553 F.3d 1110, 1113 (8th Cir. 2009) (citing *Anderson*, 477 U.S. at 247-49).

## II.  ENTITLEMENT TO FULL APPRAISAL AWARD

The heart of the parties' motions centers around the scope of the appraisal award and its preclusive effect.  Pursuant to the Policy, the appraisal panel's determination of "amount of loss" is binding.  (*See* Def.'s App., Ex. A at 39 ("The appraisers will state separately the value of the property and amount of loss.  If they fail to agree, they will submit their differences to the umpire.  A decision agreed to by any two will be binding.").)  Therefore, an examination of the scope of the appraisal panel's "amount of

loss" determination has important implications for the present motion, as that determination will establish what issues remain to be decided by the Court and which issues have already been conclusively determined by the appraisal panel.

Plaintiffs argue that the appraisal award determined that $262,368.51 was the amount of loss caused by hail damage. Kiln, on the other hand, argues that the appraisal panel did not make a determination that the amount of loss was caused by hail damage, and even if it had, that the Court may revisit that issue to determine that the loss to the roofs was actually caused by wear and tear and is therefore excluded under the Policy. Based on the record before it, the Court concludes that the appraisal panel had the authority to consider the cause of the loss as part of its amount of loss determination, and in rendering the appraisal award made a determination that the damages awarded were caused by hail. Because the Court finds that the parties in their motions have identified no coverage issues related to the cause of loss determination, the Court concludes that the appraisal award and its accompanying determination that the award was for damages caused by hail is conclusive and binding on the parties.

### A.    Appraisal Panel's Authority

In *Quade v. Secura Insurance*, 814 N.W.2d 703 (Minn. 2012), the Minnesota Supreme Court examined the scope of an appraisal panel's authority and the preclusive effect of appraisal panel determinations. In that case the Quades submitted a claim to their property insurer – Secura – for storm damage to several buildings. *Id.* at 704. Secura paid for some of the damages which it determined were caused by the storm, but

declined to pay for others, determining that some damage to the roofs of the buildings was due to deterioration over a period of time – which was an excluded cause of loss under the Quades' insurance policy. *Id.* Instead of pursuing an appraisal pursuant to a clause in the policy that provided either party with the right to demand appraisal of the amount of loss in the event of a dispute, the Quades filed a lawsuit against Secura alleging breach of contract. *Id.* at 704-05. The Quades asserted "that the appraisal clause did not apply to their claim for damage to the roofs because the parties disputed whether the damage to the roofs is covered by the policy – not the cost of repairing the roofs." *Id.* at 705. Secura, on the other hand argued that "coverage questions deal with whether an event, such as a windstorm, is covered in the first instance, while the question of amount of loss relates to the damage done by the covered event and the cost to repair that damage." *Id.* at 706.

The court began by explaining that the phrase "amount of loss" as used in insurance policy appraisal clauses is not ambiguous and "in the insurance context, an appraiser's assessment of the 'amount of loss' necessarily includes a determination of the cause of the loss, and the amount it would cost to repair that loss." *Id.* Although the court noted that "[t]he scope of appraisal is limited to damage questions while liability questions are reserved for the court," it acknowledged that "the line between liability and damage questions is not always clear." *Id.* The court went on to explain:

> The record in this case suggests that the dispute here involves both a question of damages and a question of liability. The Quades assert that the damage to the roofs is a covered loss for wind damage. Secura asserts that the damage to the roofs is due to wear and tear and is excluded under the Policy. We believe that under the circumstances of this case a

determination of the "amount of loss" under the appraisal clause necessarily includes a determination of causation. Coverage questions, such as whether damage is excluded because it was not caused by wind, are legal questions for the court as this case goes forward. The Quades are incorrect that appraisers can never allocate damages between covered and excluded perils. In this case, the causation question involves separating loss due to a covered event from a property's preexisting condition.

*Id.* at 706-07.

The court clarified that "an appraisal award does not preclude the insurer from subsequently having its liability on the policy judicially determined" and that "[i]f the appraisal award is flawed because it answers questions of liability outside the scope of the appraisal process, then the award can be challenged later before the district court." *Id.* at 707-08 (internal quotation marks omitted). Specifically, the Court concluded that "the appraisers must necessarily determine the cause of the loss, as well as the amount necessary to repair the loss. However, to the extent that determination goes beyond the scope of appraisal and interprets policy exclusions, that determination is reviewable by the district court." *Id.* at 708. Whether an appraisal award will be conclusive on a particular issue in any given case "will depend on the nature of the damage, the possible causes, the parties' dispute, and the structure of the appraisal award." *Id.*

B.    **Scope of Appraisal Award**

Kiln appears to argue generally that the appraisal panel did not make a cause of loss determination, but it has presented no specific evidence or interpretation of the appraisal award in support of this position. Upon its own examination of the record, the Court finds that although the appraisal award at issue here is far from a model of clarity,

the appraisal panel did appropriately consider and determine that the $262,368.51 amount of loss was caused by the hail storm. Several aspects of the appraisal hearing and the appraisal award indicate that the appraisal panel considered and determined that the damages awarded had been caused by the hail storm. First, the issue in the appraisal hearing involved a dispute between Plaintiffs and Kiln as to whether the damage to the roofs was caused by hail damage or whether that damage was due to wear and tear. This is almost identical to the dispute in *Quade* where the insureds asserted that damage to their roofs was the result of wind damage and the insurance company asserted that the damage was due to wear and tear. 814 N.W.2d at 706. The Minnesota Supreme Court held that under the circumstances of that case "a determination of the 'amount of loss' under the appraisal clause necessarily includes a determination of causation." *Id.* at 706-07. Therefore the nature of the damage, the possible causes, and the nature of the parties' dispute in this case – being identical to those in *Quade* – strongly indicate that by determining the amount of loss, the appraisal panel necessarily considered what caused the loss.

This conclusion is further supported by the nature and scope of the appraisal hearing. At the initial appraisal site visit on April 29, 2009, the parties discussed areas of the townhomes that had been damaged by the hail storm. Additionally, at the August 27, 2009 hearing the appraisal panel stated that the focus of the hearing was "the scope and price issues **pertaining to the storm damage claim** that is at issue." (Tr. 5 (emphasis added); *see also* Tr. 78 (explaining that certain evidence was unnecessary because "it's irrelevant for our determination as to the damages as a result of hail"); Tr. 79 ("[W]e're

here to take one small part which is the scope and pricing of the hail claim from May 31,

2008.").)  The attorney representing Kiln at the hearing similarly presented the issue as

"did **hail** damage the Creekwood Townhome buildings, specifically the roofs, but also

other parts of the building as well," (Tr. 9 (emphasis added)) and Irmiter, speaking on

behalf of Plaintiffs, provided the panel with an "estimate of the damages **as related to**

**the storm**" (Tr. 17 (emphasis added)).  The parties then presented extensive testimony to

the appraisal panel related to whether the roofs had suffered hail damage and whether

they were deteriorated due to wear and tear prior to the storm event.  One of the

appraisers who submitted an affidavit in connection with the present litigation also

indicated that he understood the appraisal panel to be making a cause of loss

determination.  Specifically, Herzog averred that the appraisal panel was "initially tasked

with determining the fair and reasonable cost to repair roof damage to Plaintiffs' five

townhomes **resulting from a hailstorm**" and heard testimony about "the damage

**resulting from the May 31, 2008 hailstorm**."  (Herzog Aff. ¶¶ 4, 9 (emphasis added).)

The nature of the testimony and the appraisal panel's own description of its task therefore

indicates that the appraisal panel's amount of loss determination included a determination

that the loss was caused by hail damage.

Finally, the structure of the appraisal award itself indicates that the appraisal panel

made a cause of loss determination in assessing the amount of loss.  On the appraisal

award form, in the line for "cause" the appraisal panel wrote "storm – wind & hail."

(Second McColgan Aff., Ex. 14 at 2.)  Additionally, although again, far from a model of

clarity, the appraisal panel's calculations with respect to the roof award – multiplying the

replacement cost by 65%, suggest that the panel was determining the replacement costs for only a portion of the roof – the portion that was damaged by hail.  If the appraisal panel had merely been assessing, in the abstract, the cost of replacing Plaintiffs' roofs, without reference to what caused damage, awarding only a portion of the replacement costs would make little sense.  Additionally, appraiser Norcia clarified that he understood the appraisal award to "provide[] the amount of loss for items which were either directly damaged **from the hail event**, or were immediately effected by the replacement of said hail damaged items."  (Norcia Aff. ¶ 4 (emphasis added).)  Therefore, the Court finds that in determining the amount of loss at the Property as $262,368.51, the appraisal panel necessarily determined that this amount of loss was caused by hail damage.

## C.    Conclusive Effect of Appraisal Award

Kiln next argues that, even if the appraisal panel concluded that the loss to the Property was caused by hail damage, that causation finding is not conclusive and is instead subject to judicial review.  But Kiln's contention is contrary to the Minnesota Supreme Court's holding in *Quade*.[10]  As explained above, in *Quade* the court drew a

---

[10] Additionally Kiln argues that *Quade* is not applicable to the facts of this case, because its holding is limited to circumstances in which an insured attempts to bypass an appraisal proceeding by filing a lawsuit first without engaging in an appraisal, explaining "[o]ur case is distinguishable because an appraisal did in fact take place before suit was filed."  (Def.'s Mem. in Opp'n to Mot. for Summ. J. at 16, May 17, 2013, Docket No. 252.)  Although *Quade* did deal with an attempt to bypass the appraisal process, the court in that case did not limit its discussion to whether an appraisal is a prerequisite to a lawsuit.  Instead the bulk of the opinion in *Quade*, as explained above, deals with the scope of an appraisal panel's authority and the conclusive effect of its determinations.  Those holdings apply with equal force here, where the appraisal proceeding has already concluded.

distinction between determinations of the appraisal panel that are given binding effect –
the amount of loss and cause of the damage – and determinations of the appraisal panel
that are subject to review by the district court – coverage questions and interpretation of
policy exclusions.   814 N.W.2d at 707-08.   Specifically, the court explained that
"[c]overage questions, such as whether damage is excluded because it was not caused by
wind, are legal questions for the court as this case goes forward." *Id.* at 707.   Notably,
the court did not define **causation** itself as a coverage question, but instead interpreted
coverage questions to relate to whether damages caused by a particular event are
excluded under the policy.   In other words, if an appraisal panel determines that loss is
caused by hail, the coverage question left for the court is whether hail damage is a
covered cause of loss under the policy or whether some policy exclusion applies to bar
recovery.

　　Here, Kiln asks the Court to revisit the issue of causation.   Kiln, however, has
identified no Policy provision that the appraisal panel interpreted, misinterpreted, or
applied in determining that the $262,368.51 amount of loss to the Property was caused by
hail damage. *See Cedar Bluff Townhome Condo. Ass'n, Inc. v. Am. Family Mut. Ins. Co.*,
No. A13-0124, 2013 WL 6223454, at *3-*4 (Minn. Ct. App. Dec. 2, 2013) (allowing
challenges to an appraisal panel's determination where the parties argued that the
appraisal panel had necessarily interpreted the phrase "other property of like kind and
quality" in determining the cost of replacement siding).   Instead, Kiln essentially requests
that the Court "separat[e] loss due to a covered event from a property's preexisting
condition." *See Quade*, 814 N.W.2d at 707.   But this allocation of damages is part of

"the causation question" and in turn part of the binding "amount of loss" determination as defined by the court in *Quade*, rather than a legal question for the Court. *Id.*

Kiln appears to acknowledge that this Court's role is limited to coverage disputes, by explaining that "it does not matter whether the Appraisal Panel determined causation in rendering the Appraisal Award. Under *Quade*, it is up to this Court to determine if the loss is covered under the Policy and Kiln is liable to Plaintiffs for the remainder of the appraisal award." (Def.'s Mem. in Opp'n to Mot. for Summ. J. at 19, May 17, 2013, Docket No. 252.) According to Kiln's own argument, therefore, the question for this Court is whether a loss caused by hail is covered under the Policy and whether Kiln is liable to Plaintiffs for the remainder of the appraisal award. Because Kiln has not identified any part of the Policy that would exclude coverage for losses caused by hail damage, it has not identified any reviewable portion of the appraisal panel's award.

Finally, the Court notes that Kiln's interpretation of *Quade* would require the district court to revisit every causation determination of an appraisal panel because a causation determination is always at least tangentially related to coverage and an insurer's ultimate liability under a policy. Such a practice would undermine the court's determination in *Quade* that an appraiser's determination of the amount of loss is binding on the parties and that "an appraiser's duty to determine the 'amount of loss' requires the appraiser to determine causation." 814 N.W.2d at 706. Although "the line between liability and damage questions" will not always be clear, *see id.*, the Court finds that where, as here, the party seeking to challenge the appraisal award has not identified a coverage question that the appraisal panel inappropriately considered or resolved, the

appraisal panel's determination of the cause of loss is conclusive and binding on the parties. Accordingly, the Court finds that Plaintiffs are entitled to recover the remaining $151,178.46 amount of loss awarded by the appraisal panel for damages caused by the hail storm.

### D.    Previous Settlement Funds

Finally, Kiln argues that Plaintiffs cannot recover the remainder of the appraisal award because the settlements in the stucco litigation and the water intrusion insurance claim that were used, in part, to replace roofs on the Property, preclude Plaintiffs from recovering any additional damages related to those roofs. As support for this argument, Kiln cites *Leamington Co. v. Nonprofits' Insurance Association*, 661 N.W.2d 674 (Minn. Ct. App. 2003). In *Leamington*, a tortfeasor paid property owners for damage caused to the property. *Id.* at 676. The property owners then sued the tortfeasor's insurance company to recover for the same damages. *Id.* The district court held that the money received from the tortfeasor would be credited against any settlement or judgment the property owners obtained from the insurance company. *Id.* The court of appeals affirmed and began by recognizing the common-law collateral source rule, which provides that "money or services that a plaintiff receives 'in reparation of the injury from a source other than the tortfeasor' will not be 'credited against the tortfeasor's liability' even though they may partially or completely reimburse the plaintiff for damages suffered." *Id.* at 678 (quoting *Hueper v. Goodrich*, 314 N.W.2d 828, 830 (Minn. 1982), *superseded by statute*, Minn. Stat. § 548.251, *as recognized in Swanson v. Brewster*, 784

N.W.2d 264 (Minn. 2010)).  But the court noted that the collateral source rule does not apply to payments made by a tortfeasor or a person acting for him, including payments made under a tortfeasor's insurance policy.  *Id.* at 679 (citing Restatement (Second) of Torts § 920A(1) (1979)).  The court held that this exception from the collateral source rule was equally applicable to a plaintiff's attempt to recover from a tortfeasor's insurer after receiving funds from the tortfeasor, explaining "[j]ust as funds from a tortfeasor's insurer may be applied against any recovery from that tortfeasor, so should funds received from the tortfeasor be applied against any recovery from the tortfeasor's insurer."  *Id.*  The court explained that this result prevented "the party damaged by the acts of the tortfeasor [from] obtain[ing] a double recovery from essentially the same source."  *Id.*

The Court concludes that *Leamington*'s holding has no bearing on the issues before the Court for several reasons.  First, unlike *Leamington*, the dispute in this case is between an insured and insurer who have a contractual relationship that defines their responsibilities to one another, therefore resort to the common law of torts in order to ascertain Kiln's payment obligations is both unnecessary and inappropriate.  Minnesota law is clear that "the rights of an insurer and an insured are established as of the time of the [loss], and those rights are not affected if the insured eventually is compensated for the loss from another source."  *Bd. of Trs. of First Congregational Church of Austin v. Cream City Mut. Ins. Co. of Milwaukee, Wis.*, 96 N.W.2d 690, 696 (Minn. 1959).  Therefore "[t]he recovery of an insured will not be diminished because of the fact that he might have collateral contracts with third persons which operate to relieve the insured

- 34 -

from the loss for which the insurer agreed to compensate him." *Id.*  Kiln has pointed to no language in the Policy that relieves it of its obligation to pay for covered losses if Plaintiffs first obtain coverage of a different loss, insured by a different insurance company, which affects the same part of the Property as the covered loss under the Kiln Policy.

Second, unlike *Leamington* there is no relationship between Kiln and the entities involved in the Stucco litigation and the water intrusion insurance claim.  Therefore, there is no possibility that Plaintiffs will "obtain a double recovery from essentially the same source." *Leamington*, 661 N.W.2d at 679.  Finally, Kiln has presented no evidence that the settlements obtained by Plaintiffs in the prior lawsuit and insurance claim were compensation for the **same loss** as the loss for which Plaintiffs now seek coverage – namely, loss due to a hail storm.  Although the prior settlements and the present litigation are both related, at least in part, to Plaintiffs' roofs, the record reflects that Plaintiffs sought compensation for construction defects and water infiltration to the Property in the earlier claims.  That construction defects and water infiltration also impacted the roofs and Plaintiffs used some of those funds to replace the roofs is immaterial.  Simply because an insured chooses to use a pool of his own money – obtained from another source – to conduct certain repairs does not allow an insurance company to avoid its obligation to pay for a covered loss.  Accordingly, the Court finds that any previous settlement funds received by Plaintiffs do not bar their recovery of the full appraisal award for the covered losses under the Policy.  Therefore, the Court concludes that no material issue of fact remains regarding Plaintiffs' breach of contract claim based on

Kiln's failure to pay the remainder of the award, and will enter judgment against Kiln in the amount of $151,178.46.

## III.     SECOND APPRAISAL

Plaintiffs and Kiln both move for summary judgment on Plaintiffs' claim that Kiln breached the terms of the Policy by refusing to submit to a second appraisal.  Plaintiffs argue that, under the Policy, they are entitled to a second appraisal to determine the amount of loss related to building code upgrades and material unavailability.

### A.     Material Unavailability

In determining the amount of loss suffered to property, depending upon the valuation measures provided in the insurance policy, appraisers are sometimes required to determine the availability of replacement materials.  *See QBE Ins. Corp. v. Twin Homes of French Ridge Homeowners Ass'n*, 778 N.W.2d 393, 396, 398 (Minn. Ct. App. 2010). For example, with respect to roofs, if the shingles used on the original roof are no longer available, in determining the amount of loss, an appraisal panel will often need to consider the cost of obtaining other, similar shingles.  *Id.* at 396.

Plaintiffs base their request for a new appraisal regarding material unavailability on the comment in the appraisal award stating: "Material availability not considered." (Second McColgan Aff., Ex. 14 at 2.)  In particular, Plaintiffs appear to be arguing that because the original shingles were unavailable to repair the roof, they are entitled to coverage for the cost of replacing the entire roof with different shingles.  The Court finds that Plaintiffs request for a second appraisal is improper because Plaintiffs failed to

provide the appraisal panel with a fair opportunity to make a factual determination regarding material unavailability and because Plaintiffs failed to identify any language in the Policy that entitles them to recover the cost of replacing the entire roof even if the original shingles are unavailable and therefore failed to show that the appraisal panel was required to consider material unavailability.

As an initial matter, the Court notes that the Policy specifies that if the parties disagree on "the amount of loss," then "either may make written demand for **an** appraisal of the loss." (Def.'s App., Ex. A at 39 (emphasis added).) The plain language of the Policy indicates that for each loss sustained under the Policy, a single appraisal proceeding is available. *Midwest Family Mut. Ins. Co. v. Wolters*, 831 N.W.2d 628, 636 (Minn. 2013) (explaining that unambiguous language in an insurance policy is given its plain and ordinary meaning). Because the Policy entitles the parties to one appraisal proceeding, this provision necessarily requires the insureds to raise, at the appraisal proceeding, all claimed damages sustained in a single instance of loss that they wish to recover, rather than demanding separate appraisal proceedings for different types of damages suffered in a single loss event.

Here, the Court concludes that Plaintiffs failed to present sufficient evidence at the appraisal hearing to adequately raise the issue of material availability and provide the appraisal panel with a fair opportunity to decide questions of amount of loss related to material unavailability. The only mention Plaintiffs made at the appraisal hearing regarding materials used to repair the roofs was Irmiter's statement that "it's our contention that because the shingle is no longer manufactured we can't replace just half a

roof." (Tr. 27.)  Plaintiffs did not provide any evidence documenting the unavailability of the shingles, did not discuss the availability of other shingles of similar kind and quality, and did not compare the shingles used in the replacement of the roofs to the original shingles.  The only other mention of material availability at the hearing came from May, who testified that he did not know whether the original shingles were available, and testified that in a standard case if shingles were no longer available he would "put a repair estimate together, a replacement estimate together, advise [Kiln] if this shingle is no longer manufactured, before I would do that I would send that to Intel or some other source to see if there is any like kind or quality and let the carrier make that decision."  (Tr. 110.)  Plaintiffs do not contest that they undertook none of these processes.

The single statement by Irmiter that he believed the entire roof needed to be replaced because the original shingles were unavailable did not provide the appraisal panel with sufficient information or evidence to make a determination regarding material availability and how any availability issues affected the amount of loss.  Plaintiffs do not contend that the appraisal panel prevented them from presenting appropriate evidence to support their contention that the original shingles were unavailable and therefore replacement of the entire roof was warranted.  Instead, Plaintiffs now essentially ask the Court to allow them a do-over, and an opportunity to present issues of amount of loss related to the hail damage to an appraisal panel.  Allowing plaintiffs to initiate a new appraisal process or challenge the appraisal panel's determination of amount of loss any time the plaintiffs failed to present adequate evidence of a particular loss suffered at an

original appraisal hearing would undermine the purpose of appraisal panels as providing "the plain, speedy, inexpensive and just determination of the extent of the loss." *Quade*, 814 N.W.2d at 707 (internal quotation marks omitted).

Furthermore, the Court finds that a second appraisal proceeding is particularly inappropriate where, as here, Plaintiffs have not identified a single provision of the Policy supporting their contention that a determination of material availability is a necessary part of determining amount of loss under the Policy.  In other words, Plaintiffs have pointed to no part of the Policy which would entitle them to the replacement cost of the entire roof in the event that the original shingles are unavailable.   In the absence of any argument from the parties, the Court will not speculate as to the application of the Policy and its many potentially relevant provisions to these circumstances.  Therefore, Plaintiffs have failed to demonstrate that the appraisal panel's determination of amount of loss – after concluding that material availability was not an issue – was inappropriate as a coverage matter.  Accordingly, the Court finds that Plaintiffs had identified no reviewable errors in the appraisal panel's determination and are not entitled to a second appraisal proceeding.[11]

---

[11] Kiln also appears to argue that material availability must be considered, but contends that the determination is a coverage issue, which should be addressed by this Court rather than by an appraisal panel.  But, like Plaintiffs, Kiln has identified no language in the Policy that supports its contention that the issue of material availability must be decided as a coverage matter before the Court could award Plaintiffs the remainder of the appraisal award.  Furthermore, Kiln's contention is contrary to Minnesota case law which indicates that material availability is a question of fact bound up in the determination of amount of loss, and therefore should be considered by the appraisal panel – even if the Court must still determine coverage questions later.  *See QBE Ins. Corp.*, 778 N.W.2d at 398 (holding that where an insurance policy

(Footnote continued on next page.)

As a final matter, the Court notes that this case does not require the Court to decide the potentially more difficult question of the proper recourse for an insured if the insured does provide substantial evidence of a particular type of damage or damage-related issue and the appraisal panel explicitly refuses to make a determination with regard to that issue.  Nor does this case require the Court to decide what type of judicial review is appropriate where the appraisal panel fails to make a finding that is essential to determining the extent of coverage under a particular policy.  Under the circumstances here – where Plaintiffs failed to present evidence to the appraisal panel regarding material unavailability and have failed to identify any specific portion of the Policy that would make a determination of material unavailability relevant to the amount of loss, the Court finds that the original appraisal panel award is binding.

## B.    Code Upgrades

Plaintiffs also argue that a second appraisal panel is warranted to consider portions of the amount of loss from the hail storm that relate to expenses associated with updating the buildings on the Property to bring them into compliance with applicable building

_____
(Footnote continued.)

allowed the panel to "value the loss at the amount actually and necessarily expended to repair or replace the shingles" the panel properly determined the value of the loss after determining that "the loss could not be remedied by repair or replacement because the shingles used on the buildings were no longer manufactured and/or the non-damaged shingles were too worn to be suitable to connect to new shingles"); *Seamon v. Acuity*, No. A11-429, 2011 WL 6015355, at *5 (Minn. Ct. App. Dec. 5, 2011) (finding that material availability could be considered by the appraisal panel because "[a] determination of loss – the amount actually and necessarily spent to repair or replace the roof with 'like' materials – can only be made after evidence is presented as to the feasibility of repair and the availability of materials").

codes.  The Court finds that the preceding analysis applies with equal force to the issue of code upgrades.  At the appraisal hearing, Irmiter testified generally that certain costs of repair to the Property were required by city and zoning regulations.  When asked by appraiser Herzog whether he had any documentation from his discussions with the building official regarding the work to the Property mandated by city and zoning regulations, Irmiter indicated that he believed the information was confidential and did not have any of that material with him, but could provide additional information to the panel if necessary.  (Tr. 31-32.)  Herzog noted in his affidavit that Irmiter provided no citations to the relevant building codes and no documentation of the upgrades that were performed on the Property allegedly related to code upgrades.  As with the issue of material availability, the Court finds that Plaintiffs' presentation at the appraisal hearing was insufficient to demonstrate any entitlement to an award based on code upgrades.  Accordingly, the appraisal panel did not err in failing to award any damages based on this general testimony and Plaintiffs are not entitled to reargue the issue of code upgrades before a new appraisal panel.

Finally, Plaintiffs have again cited to no provision of the Policy in support of their argument that code upgrades are an essential part of the amount of loss or that the appraisal panel somehow made a determination of amount of loss that cannot be awarded under the Policy due to its failure to award damages for code upgrades.[12]  Accordingly,

---

[12] Indeed, at least one provision of the Policy suggests that no such damages would properly be awardable, even if the panel had considered them.  *See* Def.'s App., Ex. 1 at 40

(Footnote continued on next page.)

under the circumstances of this case where the issue of code upgrades was not adequately presented to the appraisal panel and Plaintiffs have identified no Policy provision requiring consideration of that issue, the Court concludes that the appraisal award is conclusive, and finds that Kiln is entitled to summary judgment on Plaintiffs' claim for breach of the insurance policy for failing to engage in a second appraisal proceeding.[13]

## IV.   STANDING

Finally, Kiln argues that summary judgment should be granted in its favor with respect to Creekwood's claims because Creekwood lacks standing.  Specifically, Kiln argues that Creekwood lacks an insurable interest in the Property, and therefore is not entitled to recover on a breach of insurance contract claim.  "[A]n insurable interest exists where the insured can suffer a loss if the subject property is damaged." *Nw. Nat'l Bank v. Maher*, 258 N.W.2d 623, 624 (Minn. 1977) (internal quotations omitted).  "[I]t is not necessary that the insured should have an absolute right of property, and . . . he has an insurable interest if, by the destruction of the property, he will suffer a loss, whether or not he has or has not any title to, lien upon, or possession of the property itself." *Crowell v. Delafield Farmers Mut. Fire Ins. Co.*, 463 N.W.2d 737, 738 (Minn. 1990) (internal

---

(Footnote continued.)

("The cost to repair, rebuild or replace does not include the increased cost attributable to enforcement of any ordinance or law regulating the construction, use or repair of any property.")

[13] Because the Court concludes that Plaintiffs have not demonstrated entitlement to a second appraisal proceeding, the Court need not consider whether, as Kiln argues, the Minnesota Uniform Arbitration Act applies to appraisal proceedings and would operate to bar Plaintiffs' breach of contract claim as being outside the 90 day deadline for seeking court correction, vacation, or modification of an award. *See* Minn. Stat. §§ 572B.23, 572B.24.

quotation marks omitted).   "[A]ny limited or qualified interest, whether legal or equitable, or any expectancy of advantage, is sufficient to constitute an insurable interest. *Id.* at 739 (internal quotation marks omitted).  A mere expectation of a property interest may be insufficient to constitute an insurable interest.  *See Anderson v. State Farm Fire & Cas. Co.*, 397 N.W.2d 416, 418 (Minn. Ct. App. 1986) (finding no insurable property interest where "[a]lthough William Anderson hoped to purchase the property someday and had been using the property for a substantial amount of time, his claim to the garage was only an expectancy.  Consequently, he did not have a risk of **direct** pecuniary loss by damage or destruction of the garage itself." (emphasis in original)).   "A party's rights to insurance proceeds are determined by the status of the party's interests at the time of the [loss]."  *Id.* at 417.

The record contains undisputed evidence that Creekwood executed lease agreements with tenants for the townhomes on the Property during the time period in which the hail storm occurred.  (Lewandowski Dep. 12:18-13:12.)[14]  Therefore, at the time of the loss Creekwood had an independent pecuniary interest in the rental contracts for the insured property.  In other words, by destruction or damage to the Property, Creekwood would suffer a loss in the form of lost rents or tenants.  This is a substantial and real pecuniary interest that demonstrates an insurable interest in the Property.  *See Counihan v. Allstate Ins. Co.*, 25 F.3d 109, 112 (2d Cir. 1994) (explaining that collecting

---

[14] Although only the 2011 rental agreements between Creekwood and tenants of the Property appear in the record, Kiln has presented no evidence disputing Lewandowski's deposition testimony that Creekwood executed lease agreements at the Property prior to 2011.

rents on a property supported a finding of an insurable interest because "rent represents a significant portion of the exploitable economic value of [a] home" (alteration in original) (internal quotation marks omitted)).  Accordingly, the Court will deny Kiln's motion for summary judgment with respect to Creekwood as it relates to standing.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.     Plaintiffs' Motion for Summary Judgment [Docket No. 239] is **GRANTED in part** and **DENIED in part** as follows:

a.     The motion is **GRANTED** with respect to Count I of the Amended Complaint to the extent it seeks recovery of the $151,178.46 amount of loss found by the appraisal panel and not paid by Kiln.

b.     The motion is **DENIED** with respect to Count I of the Amended Complaint to the extent it seeks a second appraisal proceeding.

2.     Defendant's Motion for Summary Judgment [Docket No. 244] is **GRANTED in part** and **DENIED in part** as follows:

a.     The motion is **DENIED** with respect to Count I of the Amended Complaint to the extent that Count I seeks recovery of the $151,178.46 amount of loss found by appraisal panel and not paid by Kiln.

b.     The motion is **GRANTED** with respect to Count I of the Amended Complaint to the extent it seeks a second appraisal proceeding.

3.      Judgment shall be entered against Defendant in the amount of $151,178.46.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED: March 31, 2014
at Minneapolis, Minnesota.

_____
JOHN R. TUNHEIM
United States District Judge